David M. TRAVIS, et al.,
Plaintiffs–Appellees,

v.

Janet RENO, Attorney General of the United States, and United States of America, Defendants–Appellants.

No. 98–2881.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 12, 1998.

Decided Dec. 16, 1998.

Jon Deitrich, Adelman, Adelman & Murray, Milwaukee, WI, for David M. Travis, Fred A. Risser, Robert K. Zukowski.

James E. Doyle, Susan K. Ullman, Office of the Atty. Gen., Madison, WI, for Roger D. Cross, Wisconsin Dept. of Transp.

Craig M. Blackwell, Mark B. Stern, Dept. of Justice Civil Div., Washington, DC, for Janet Reno, U.S.

Thomas H. Odom, Arter & Hadden, Washington, DC, Bill Pryor, Office of the Atty. Gen., Jack Curtis, Dept. of Public Safety, Montgomery, AL, for State of Alabama.

Thomas H. Odom, Arter & Hadden, Washington, DC, W.A. Drew Edmondson, Office of the Atty. Gen., Oklahoma City, OK, John K. Lindsey, Dept. of Public Safety, Oklahoma City, OK, for State of Oklahoma.

Before FLAUM, EASTERBROOK, and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

This case poses the question whether Congress has the power to enact the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721–25, which regulates disclosures of the information that states maintain in drivers' records. The district court held that the Act exceeds Congress' authority under the commerce clause (read in light of the tenth amendment) because the Act commandeers states to do the national government's bidding. 12 F.Supp.2d 921 (W.D.Wis.1998). After the district court released its opinion, the fourth circuit concluded that the Act is unconstitutional because it applies exclusively to states. *Condon v. Reno,* 155 F.3d 453 (4th Cir.1998). But the tenth circuit has disagreed and held that the Act is valid. *Oklahoma v. Reno,* 161 F.3d 1266 (10th Cir.1998), reversing 994 F.Supp. 1358 (W.D.Okla.1997). Accord, *Pryor v. Reno,* 998 F.Supp. 1317 (M.D.Ala.1998). Although each side to this controversy can take comfort from decisions of the Supreme Court, we conclude that, whatever may be said about the Act's wisdom, it is within the commerce power and

compatible with constitutional principles of federalism. This eliminates any need to discuss whether the Act also is within the legislative power under § 5 of the fourteenth amendment.

## I

■ The Act forbids the disclosure of "personal information about any individual obtained by the [State's] department [of motor vehicles] in connection with a motor vehicle record" except to the extent that the Act itself permits or requires disclosure. 18 U.S.C. § 2721(a). Elsewhere the Act requires disclosure for law enforcement and pollution-control uses; forbids disclosure for commercial uses (such as the creation of mailing lists); and makes disclosure optional for other uses, such as research and insurance. Violations of the Act are punishable by fines up to $5,000 per day. 18 U.S.C. § 2723. Wisconsin contends, and we must assume, that in order to comply with the Act it must make costly changes in the way it handles requests for access to its motor vehicle licensing records. Moreover, because Wisconsin formerly sold its records for use in creating mailing lists, and for other purposes, the Act deprives the state of approximately $8 million in annual revenue. ("Wisconsin" is shorthand for the state's Division of Motor Vehicles and its director, who intervened as plaintiffs after questions were raised about the standing of the original plaintiffs. The Division, as the regulated entity, has an Article III controversy with the United States, so we need not discuss the original plaintiffs' standing.)

## A

Driving is an interstate activity, as is the mailing-list business. Information about Wisconsin's drivers readily can affect movement and business transactions outside that state's borders. Wisconsin does not doubt that, but for the principles of state sovereignty that underlie our Nation's federal structure (and are acknowledged by the tenth and eleventh amendments), Congress would possess power under Art. I § 8 cl. 3 of the Constitution to enact this statute. The interstate components are substantial in the aggregate even if a single disclosure has but a slight effect on commerce. See *United States v. Lopez*, 514 U.S. 549, 558–61, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); *United States v. Hicks*, 106 F.3d 187 (7th Cir.1997).

■ Nonetheless, ever since *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), the Supreme Court has recognized that suppositions implicit in the structure of the Constitution limit the power of the states to tax or regulate the national government. The intergovernmental tax immunity doctrine that Chief Justice Marshall articulated in *McCulloch* (and that the Court extended in *Collector v. Day*, 78 U.S. (11 Wall.) 113, 20 L.Ed. 122 (1871), and *Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759 (1895), to federal taxation of states and their contractors) foreclosed all taxation of a governmental body or its instrumentalities on the ground that the power to tax is the power to destroy, a rationale equally applicable to the imposition of costly regulation. (It is through the power to regulate the movement of goods in interstate commerce that Congress has forbidden child labor, *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), and for a time prohibited lotteries. *Lottery Case*, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903).) Gradually intergovernmental immunity turned into a rule of nondiscrimination, under which the governmental body's protection is vicarious: one government may tax (or regulate) another's trading partners only to the extent it imposes equivalent burdens on those who do business with private citizens. See *South Carolina v. Baker*, 485 U.S. 505, 515–27, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988). Neutrality between governmental and private spheres is a principal ground on which the Supreme Court has held that states may be subjected to regulation when they participate in the economic marketplace—for example, by hiring workers covered by the Fair Labor Standards Act. *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985); *Maryland v. Wirtz*, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968). See also *South Carolina*, 485 U.S. at 511–15, 108 S.Ct. 1355 (states may be required to

issue bonds in registered form); *United Transportation Union v. Long Island R.R.*, 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982) (labor laws apply to state-owned railroads); *Fry v. United States*, 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975) (states are bound by generally applicable wage and price controls). So long as public market participants are treated the same as private ones, they enjoy the protection the latter have been able to secure from the legislature; and as Congress is not about to destroy private industry (think what that would do to the tax base!) it can not hobble the states either. *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), adopted a proviso to this approach: that Congress may not disrupt the states' ability to manage core governmental functions such as police and fire protection. *Garcia* overruled *National League of Cities* after concluding that the set of traditional or essential governmental functions is too indistinct to be a constitutional norm. Even if *Garcia* should be overruled in turn, this branch of analysis would do Wisconsin no good. Nothing in the Driver's Privacy Protection Act interferes with states' ability to license drivers and remove dangerous ones from the road; it regulates external rather than internal uses of the information.

Alongside the prohibition of discrimination against the states is a rule that remains absolute, a genuine "immunity." Congress may not "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). See also *Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997); *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); *FERC v. Mississippi*, 456 U.S. 742, 762–66, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). When Congress enacted legislation requiring states to pass laws regulating nuclear waste—and to pay the steep penalty of taking title to all waste within their borders if they failed to comply—the Court replied (in *New York*) that the national government simply may not direct the states to use their legislative pow-

ers to regulate private conduct. *Printz* adds that the same principle applies to the federal government's direction that a state's executive branch enforce federal rules. Although the Constitution's supremacy clause precludes any effort by states to divorce themselves from the application of federal law when they choose to act, see *Printz*, 521 U.S. at 913, 117 S.Ct. at 2374; *FERC v. Mississippi*, 456 U.S. at 759–69, 102 S.Ct. 2126; *Howlett v. Rose*, 496 U.S. 356, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990); *Testa v. Katt*, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947); *Claflin v. Houseman*, 93 U.S. 130, 23 L.Ed. 833 (1876); *Alleghany Corp. v. Haase*, 896 F.2d 1046, 1053–56 (7th Cir.1990) (concurring opinion), vacated in part as moot, 499 U.S. 933, 111 S.Ct. 1383, 113 L.Ed.2d 441 (1991), Congress must assign the enforcement duty to federal officials unless the Constitution itself authorizes use of the states as agents (see Art. I § 4 cl. 1; *Association of Community Organizations for Reform Now v. Edgar*, 56 F.3d 791 (7th Cir.1995)). When the national government conscripts the legislative or executive arms of a state, the law violates a structural immunity and "a 'balancing' analysis is inappropriate." *Printz*, 521 U.S. at 932, 117 S.Ct. at 2383.

### B

Wisconsin seeks to persuade us that the Act has the same vice as the statutes condemned in *Printz* and *New York*. In order to comply with the Act the Division of Motor Vehicles must adopt new rules by regulation or legislation. Moreover, the Act compels employees of the Division of Motor Vehicles to take certain actions in response to requests for information and pay penalties if they fail. Wisconsin's brief observes that "the mandatory and permissible disclosure provisions of 18 U.S.C. § 2721(b) effectively command State departments of motor vehicles to establish a mechanism for determining when it [sic] has a mandatory or permissive disclosure situation". The need to establish a mechanism is the forbidden commandeering, the argument concludes. But if this is the same thing as the situation in *Printz* and *New York*, then the application of the Fair Labor Standards Act to the states likewise is unconstitutional, for the FLSA requires states to establish record-

keeping systems and to establish mechanisms for paying employees according to a national formula. Every federal law that affects the way states participate in the marketplace may do the same. Yet the basic distinction between cases such as *South Carolina* and cases such as *New York* is that states and private parties may be the *objects* of regulation, although states cannot be compelled to become regulators of private conduct. The Driver's Privacy Protection Act affects states as owners of databases; it does not affect them in their role as governments.

Congress borrowed the Act's approach from the Video Privacy Protection Act, 18 U.S.C. § 2710. Wisconsin conceded at oral argument that if the state operated a video tape rental service it would be required to comply with § 2710. But that gives away the game. Compliance with § 2710 requires the same kind of screening as does compliance with § 2721. This must mean that the steps a state agency takes to identify mandatory, discretionary, and forbidden disclosures of information from a database in its control is not the sort of "conscription" to which *Printz* and *New York* refer. *South Carolina* makes the point in language equally applicable to the Driver's Privacy Protection Act:

> Section 310 [which requires the states to issue bonds in registered form] regulates state activities; it does not ... seek to control or influence the manner in which States regulate private parties. The NGA [National Governors' Association] nonetheless contends that § 310 has commandeered the state legislative and administrative process because many state legislatures had to amend a substantial number of statutes in order to issue bonds in registered form and because state officials had to devote substantial effort to determine how best to implement a registered bond system. Such "commandeering" is, however, an inevitable consequence of regulating a state activity. Any federal regulation demands compliance. That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect. After

*Garcia*, for example, several States and municipalities had to take administrative and legislative action to alter the employment practices or raise the funds necessary to comply with the wage and overtime provisions of the Federal Labor Standards Act. Indeed, even the pre-*Garcia* line of Tenth Amendment cases recognized that Congress could constitutionally impose federal requirements on States that States could meet only by amending their statutes. See *EEOC v. Wyoming*, 460 U.S. 226, 253–254, and n. 2, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (Burger, C.J., dissenting) (citing state statutes from over half the States that did not comply with the federal statute upheld by the Court). Under the NGA's theory, moreover, any State could immunize its activities from federal regulation by simply codifying the manner in which it engages in those activities. In short, the NGA's theory of "commandeering" would not only render *Garcia* a nullity, but would also restrict congressional regulation of state activities even more tightly than it was restricted under the now overruled *National League of Cities* line of cases.

485 U.S. at 514–15, 108 S.Ct. 1355 (footnote omitted). Wisconsin might respond that states did not have to issue bonds, but that states invariably license drivers and therefore cannot escape the federal rule by withdrawing from the activity (as they could stay out of the video rental business). Yet the activity under consideration is not licensing but disclosure. Wisconsin elected to reveal (often to sell) information from its drivers' database; it could substantially limit the difficulty of compliance by limiting disclosure to the law-enforcement uses that no holder of a database (state or private) can avoid. Ability to withdraw completely from an activity has never been essential to federal regulation. Issuing bonds is a way to raise money, which states must do to operate. Likewise states must hire employees, for which federal rules determine recordkeeping and compensation obligations. There is just no blinking the fact that federal law pervasively regulates states as marketplace participants; the anti-commandeering rule comes into play only

when the federal government calls on the states to use their sovereign powers as regulators of their citizens. Because the Driver's Privacy Protection Act affects states as owners of data, rather than as sovereigns, it does not commandeer states in violation of the Constitution. Wisconsin is no more a regulator or law enforcer when it decides what information to release from its database than is the corner Blockbuster Video outlet.

### C

What persuaded the fourth circuit in *Condon* that the Act exceeds Congress' powers is a belief that the Act not only requires states to administer a federal program but also discriminates against them. The Driver's Privacy Protection Act applies *only* to states, the fourth circuit stated, and thus cannot be classified with neutral laws such as the FLSA that regulate all participants in a marketplace. A state-specific law does not provide states with the protection that private groups have arranged for themselves; it could in principle be a vehicle of destruction. Although the Driver's Privacy Protection Act applies to contractors that administer a database on a state's behalf, and to recipients of information from a state, see 18 U.S.C. § 2721(a), (c), these efforts to avoid loopholes do not ensure that public and private operators of different databases experience similar costs of compliance. For the same reason, redrafting the statute so that it would apply to "any state or private entity that operates a department of motor vehicles" (rather than to every "State department of motor vehicles", as § 2721(a) does) would be pointless; there is no equivalent private enterprise. Although the lack of private licensing bureaus makes states a legitimate class for legislation, cf. *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), it does not offer any protection from discriminatorily severe burdens on the databases that states operate.

■ Conceding this—and implicitly conceding that a law placing states at a disadvantage relative to similarly-situated private entities would be unconstitutional—the United States responds that the Act does not bear unequally on the states. Statute books teem with laws regulating the disclosure of information from databases. The Bank Se-crecy Act specifies what records banks must keep, and what information they must, may, or must not disclose (see *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974)); the Stored Wire and Electronic Communications and Transactional Records Access Act, 18 U.S.C. §§ 2701–11, deals with data maintained by phone companies; other statutes regulate the disposition of data in the hands of cable TV operators (47 U.S.C. § 551), hospitals, pharmacies, universities, accountants, credit card issuers, bill collectors (15 U.S.C. § 1618b), and so on. Professionals such as physicians and lawyers encounter additional common-law limitations on the disclosure of information from their files. The national government has subjected itself to the Freedom of Information Act, 5 U.S.C. § 552, the Privacy Act, 5 U.S.C. § 552a, the Government in the Sunshine Act, 5 U.S.C. § 552b, and the Federal Advisory Committee Act, 5 U.S.C.App. 2 §§ 1–16, and pays penalties for improper disclosure of tax return information, 26 U.S.C. § 7431. These statutes adopt record-keeping and information-disclosure criteria at least as complex, and impose a burden at least as great, as the Driver's Privacy Protection Act. It is hard to name any substantial collection of information yet to be regulated. At oral argument counsel for both Wisconsin and the original plaintiffs disclaimed any contention that Wisconsin's burden exceeds the travail of banks or other entities regulated by statutory equivalents to the Driver's Privacy Protection Act; they do not seek an opportunity to show at trial that the state's cost per motorist surpasses the cost per bank depositor or hospital patient or federal employee. Instead the argument is formal: Congress' failure to combine all information-handling rules for the entire economy into a single statute makes the Driver's Privacy Protection Act unconstitutional. By like reasoning, if an economy-wide statute differentiated in any way between state and private databases—something all but inevitable—no duties at all could be laid on the states.

So cast, the argument is incompatible with *South Carolina*, which sustained a statute that was addressed exclusively to the states. The law in question, § 310(b)(1) of the Tax Equity and Fiscal Responsibility Act of 1982,

Pub.L. 97–248, 96 Stat. 596, dealt with state and local governments alone. It amended 26 U.S.C. § 103, another statute limited to governmental bodies. Section 103(a) says that "[e]xcept as provided in subsection (b), gross income does not include interest on any State or local bond." Subsection (b) allows taxation of three kinds of state and local bonds, of which an unregistered bond is one. Congress used the tax system to induce states to issue registered bonds; the Supreme Court assumed that the "inducement" was no different from compulsion but nonetheless rejected a constitutional challenge to the statute. Congress had effectively required private borrowers to use registered bonds, too, but it did this in a different statute. If one statute addressed only to states passes muster when other laws place private parties under equivalent obligations, why not the Driver's Privacy Protection Act? Even in the world of the dormant commerce clause, where the Court enforces a rule that states may not discriminate against interstate commerce, the Justices do not insist that the nondiscriminatory framework be accomplished within a single statute or section; a burden on interstate commerce imposed by one law may be offset by another, if the bottom line is substantially equal burdens. See *General Motors Corp. v. Tracy*, 519 U.S. 278, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997).

To all of this the fourth circuit responded: "Congress may regulate the conduct of the States *only* through laws of general applicability." *Condon*, 155 F.3d at 462 (emphasis in original). The critical word is "only", and the case cited for the proposition is *New York*. The fourth circuit wrote: "the Court specifically stated that under the *Garcia* line of cases, Congress may only 'subject[ ] a State to the same legislation applicable to private parties.'" 155 F.3d at 461 n. 5, quoting from *New York*, 505 U.S. at 160, 112 S.Ct. 2408 (brackets in *Condon*). Once again, the word "only" comes from the fourth circuit rather than the Supreme Court. The full sentence in *New York* reads: "Most of our recent cases interpreting the Tenth Amendment have concerned the authority of Congress to subject state governments to generally applicable laws." This is some distance from a holding that duties imposed on state and private parties must appear in "the

same legislation". Discrimination against states is forbidden, but a nondiscriminatory system may take more than one law to implement. A statute covering all databases would rival the Internal Revenue Code for complexity without offering states any real defense from the cost and inconvenience of regulation. The Clean Air and Clean Water Acts, which could be given as examples of "generally applicable" laws affecting the states, are so riddled with exceptions, provisos, and special rules that they do not ensure equal costs for similar activities. Cf. *Chicago v. Environmental Defense Fund*, 511 U.S. 328, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994). Anyway, Brobdignagian legislation is not the Constitution's objective, even when consolidation is feasible. Wisconsin has forsworn any desire to show that Congress has imposed on the states greater practical burdens in data handling than private parties bear and therefore has forfeited any argument that the anti-discrimination component of intergovernmental immunities scuttles the Act.

## II

Plaintiffs and *amici curiae* supporting them offer additional constitutional objections to the Act. None is persuasive.

## A

■ Both Wisconsin and the original plaintiffs insist that the Act violates the eleventh amendment, but that part of the Constitution deals with the location of private litigation, not with the substance of laws. Section 2723 permits criminal and civil fines for violations of the Act's requirements. Any action under § 2723 would be brought by the United States, and the eleventh amendment does not curtail the national government's ability to sue a state in federal court. *West Virginia v. United States*, 479 U.S. 305, 311 n. 4, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987). Section 2724 authorizes private litigation against "[a] person who knowingly . . . discloses or uses" information that the Act keeps confidential, but under § 2725(2) " 'person' means an individual, organization or entity, but does not include a State or agency thereof". This prevents private actions against states, and one would think that it forestalls any concern

under the eleventh amendment. Wisconsin fears that § 2724 will be read to authorize actions against public employees in their official capacities, leading to monetary awards that must be paid from the public fisc, but the statute seems to limit suits to personal-capacity actions, which avoids constitutional problems. *Hafer v. Melo*, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). If in the future a suit under § 2724 exposes the state to financial liability, there will be time enough to determine whether the Constitution authorizes that step—which will present a question we have ducked: whether § 5 of the fourteenth amendment supports the Act and therefore authorizes Congress to override the eleventh amendment. See *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997); *Velasquez v. Frapwell*, 160 F.3d 389 (7th Cir.1998).

### B

█ The original plaintiffs—five members of Wisconsin's legislature, one newspaper editor, and one attorney—contend that the Act violates the first amendment (applied to the states by the fourteenth) by limiting their access to information in public records. One response is that the first amendment differs from the Freedom of Information Act. Peering into public records is not part of the "freedom of speech" that the first amendment protects. "There is no constitutional right to have access to particular government information, or to require openness from the bureaucracy." *Houchins v. KQED, Inc.*, 438 U.S. 1, 14, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (plurality opinion). No one thinks that the Privacy Act violates the first amendment. Well, maybe these plaintiffs *do* think this, but the position is untenable.

█ Although the Supreme Court's holdings that some access rights connected to the judicial process are protected by the first amendment, see *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), means that we cannot exclude the possibility that some particular record in a drivers-license system may in the future be deemed constitutionally exempt from the Act, this facial attack is not the time or place to explore that subject. We do not have a demand for a particular record that would put the constitutional issue in context.

We do not have the right defendant, either. Persons who want to assert a constitutional right of access to a particular record should request that record and, if access is denied, sue the record's custodian who could have disclosed it. The United States and its Attorney General, the two defendants in this suit, do not maintain systems of drivers' records and can neither grant nor deny access to any particular information. As we have stressed in recent cases, the proper defendant is the person whose actions cause injury, not the author of the legal rule that leads to those actions. *Illinois v. Chicago*, 137 F.3d 474, 478 (7th Cir.1998); *Quinones v. Evanston*, 58 F.3d 275, 277 (7th Cir.1995); *Mueller v. Reich*, 54 F.3d 438 (7th Cir.1995), vacated on unrelated grounds under the name *Wisconsin v. Mueller*, ⸺ U.S. ⸺, 117 S.Ct. 1077, 137 L.Ed.2d 212 (1997).

### C

█ The original plaintiffs and an *amicus curiae* contend that the Act violates Art. 4 § 4 of the Constitution: "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence." Even if we were to put to one side the Supreme Court's holding that claims under the guarantee clause are not justiciable when raised by private persons, see *Luther v. Borden*, 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849), and perhaps even when raised by states, see *New York*, 505 U.S. at 185, 112 S.Ct. 2408, we would see little merit to the contention. How does compliance with the Act deprive states of "a Republican Form of Government"? Surely plaintiffs don't mean that all federal laws violate the Constitution when applied to states, because they may contradict the choices made by the states' elected legislators. No sensible person believes that the supremacy clause, which explicitly binds states to federal law, contradicts the guarantee clause and thereby puts the Constitution at war with itself. No sensible person thinks that when states raise money by issuing securities in interstate commerce, they are free to commit fraud because § 17 of the Securi-

ties Act of 1933, 15 U.S.C. § 77q, the anti-fraud rule, violates the guarantee clause! Or that states are constitutionally entitled to fill their treasuries by stealing from federally-insured banks. But if some federal laws can apply to states and others cannot, how are judges to choose? It is quite enough to say that the Driver's Privacy Protection Act leaves the state's internal and political affairs alone and regulates only how it interacts with private parties who seek information in its possession.

### III

Many thoughtful people believe that *National League of Cities* is more faithful to the original constitutional plan than is *Garcia.* But our part is to apply the Supreme Court's jurisprudence as we find it. Indeed, for reasons we have discussed, Wisconsin's position would be doubtful even if *National League of Cities* were resurrected. The Driver's Privacy Protection Act affects the states as operators of databases, not as sovereigns, and does not interfere with the achievement of any essential state function or discriminate against the states. Accordingly, the judgment of the district court is

REVERSED.