RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0040p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

THE STATE OF OHIO et al.,

>Plaintiffs-Appellants,

No. 16-3093

*v.*

UNITED STATES OF AMERICA et al.,

>Defendants-Appellees.

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:15-cv-00321—Algenon L. Marbley, District Judge.

Argued: September 27, 2016

Decided and Filed: February 17, 2017

Before: COLE, Chief Judge; DAUGHTREY and MOORE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Frederick D. Nelson, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants. Alisa B. Klein, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Frederick D. Nelson, Eric E. Murphy, Peter T. Reed, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, David P. Fornshell, WARREN COUNTY PROSECUTOR, Lebanon, Ohio, Stuart Kyle Duncan, SCHAERR │ DUNCAN LLP, Washington, D.C., for Appellants. Alisa B. Klein, Mark B. Stern, Samantha L. Chaifetz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Jeffrey A. Chanay, OFFICE OF THE KANSAS ATTORNEY GENERAL, Topeka, Kansas, for Amicus Curiae.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  This case involves a novel challenge to the Patient Protection and Affordable Care Act ("Affordable Care Act" or "ACA"), and presents us with the question of whether one of the ACA's tax provisions applies to state government employers with the same force that it applies to private employers.  Plaintiffs-Appellants the State of Ohio and several of its political subdivisions and public universities ("Ohio" or the "State") filed suit against, inter alia, the United States Department of Health and Human Services ("HHS"), alleging that the Federal Government illegally collected certain monies from the State in order to supplement the Affordable Care Act's Transitional Reinsurance Program ("Program").  Arguing that the Program's mandatory payment scheme applies only to private employers and not to state and local government employers, Ohio sought a refund of all payments made on its behalf and a declaration that the Program would not apply to the State in the future.  Ohio also argued that application of the Program against the State violated the Tenth Amendment to the United States Constitution and principles of intergovernmental tax immunity.  The district court, in a thorough and reasoned opinion, granted a motion to dismiss filed by the United States, and denied a motion for summary judgment filed by Ohio.  The district court concluded that the Program applies to state and local government employers just as it applies to private employers, and that the Program as applied to Ohio does not violate the Tenth Amendment.  For the reasons stated below, we **AFFIRM**.

## I.  BACKGROUND

Congress enacted the Affordable Care Act in 2010 to address concerns regarding nationwide access to affordable, quality healthcare.  *King v. Burwell*, --U.S.--, 135 S. Ct. 2480, 2485–86 (2015) ("The Patient Protection and Affordable Care Act adopts a series of interlocking reforms designed to expand coverage in the individual health insurance market.").  Among the ACA's provisions are (1) a tax credit to help individuals purchase health insurance through public healthcare Exchanges; (2) a ban on insurers considering an individual's health when deciding whether to provide insurance or in setting the premium; and (3) a requirement that each

individual maintain insurance coverage or remit payment to the Internal Revenue Service. *Id.* at 2486–87. While many of the ACA's requirements have been the subject of widespread litigation and controversy, this case revolves around a lesser-known provision, the Transitional Reinsurance Program. *See* 42 U.S.C. § 18061. The Program is a premium-stabilization arrangement that aims to combat volatility in the individual market by collecting payments from "health insurance issuers" and "group health plans" and distributing those payments over a three-year period to health insurance issuers that cover high-risk individuals in the individual market. *See* Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2014 (Final Rule), 78 Fed. Reg. 15,410, 15,411 (Mar. 11, 2013) ("The Affordable Care Act establishes . . . a transitional reinsurance program . . . to provide payments to health insurance issuers that cover higher-risk populations and to more evenly spread the financial risk borne by issuers."). Specifically, the ACA mandates that:

**(1) In general**

> In establishing the Federal standards under section 18041(a) of this title, the Secretary, in consultation with the National Association of Insurance Commissioners (the "NAIC"), shall include provisions that enable States to establish and maintain a program under which—
>
> **(A)** health insurance issuers, and third party administrators on behalf of group health plans, are required to make payments to an applicable reinsurance entity for any plan year beginning in the 3-year period beginning January 1, 2014 (as specified in paragraph (3)[)], and
>
> **(B)** the applicable reinsurance entity collects payments under subparagraph (A) and uses amounts so collected to make reinsurance payments to health insurance issuers described in subparagraph (A) that cover high risk individuals in the individual market (excluding grandfathered health plans) for any plan year beginning in such 3-year period.

42 U.S.C. § 18061(b)(1) (footnote omitted); *see also id*. § 18041(a)(1)(C), (c)(1) (providing that HHS may establish reinsurance programs for states that decline to do so). Ohio's reinsurance program is operated by HHS.

The State of Ohio and several of its political subdivisions have paid contributions (totaling approximately $5.4 million for benefit year 2014) to the Program under protest. Additionally, four state universities that have joined Ohio in this suit (University of Akron, Shawnee State University, Bowling Green State University, and Youngstown State University) have paid nearly $765,000 to the Program. R. 13 (Am. Compl. at 9–13) (Page ID #67–71).

Of the approximately $25 billion in revenue that is expected to be generated from the Program, $20 billion is paid to certain health insurance providers to supplement those providers covering high-risk individuals. 42 U.S.C. § 18061(b)(3)(B)(ii). The remaining five billion dollars are "deposited into the general fund of the Treasury of the United States and may not be used" for the Program. *Id.* §§ 18061(b)(3)(B)(iii), (iv), and (b)(4).

> The term "health insurance issuer" as it applies to the transitional reinsurance program,
>
> means an insurance company, insurance service, or insurance organization (including a health maintenance organization, as defined in paragraph (3)) which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance (within the meaning of section 514(b)(2) of the Employee Retirement Income Security Act of 1974 [29 U.S.C.A. § 1144(b)(2)]. Such term does not include a group health plan.

42 U.S.C.A. § 300gg-91(b)(2). The term "group health plan,"

> means an employee welfare benefit plan (as defined in section 3(1) of the Employee Retirement Income Security Act of 1974 [29 U.S.C.A. § 1002(1)]) to the extent that the plan provides medical care (as defined in paragraph (2)) and including items and services paid for as medical care) to employees or their dependents (as defined under the terms of the plan) directly or through insurance, reimbursement, or otherwise.

42 U.S.C.A. § 300gg-91(a)(1). The amount owed by each health insurance issuer and group health plan is determined by multiplying enrollment count (as self-reported by each required entity) by a previously determined contribution rate for each applicable benefit year. 45 C.F.R. § 153.405(a).

On January 26, 2015, Plaintiffs (State of Ohio; Warren County, Ohio; The Ohio Department of Administrative Services; University of Akron; Shawnee State University; Bowling Green State University; and Youngstown State University) filed this action against the

United States, HHS, and the Secretary of HHS in her official capacity.  R. 1 (Compl.) (Page ID #1).  On February 13, 2015, Plaintiffs filed an Amended Complaint adding Plaintiff Ohio Turnpike and Infrastructure Commission.  R. 13. (Am. Compl.) (Page ID #58).  The Amended Complaint alleges that:

1. The United States illegally or erroneously assessed or collected tax revenue from Plaintiffs;

2. The Secretary's interpretation of group health plans is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; and

3. Defendants collected tax revenues in violation of the Tenth Amendment to the United States Constitution, anti-commandeering principles, and the Intergovernmental Tax Immunity Doctrine.

R. 13 (Am. Compl. at 14–18) (Page ID #72–76).  On March 25, 2015, the United States District Court for the Southern District of Ohio issued a scheduling order memorializing the parties' agreement to forgo discovery and submit the case on motions.  R. 16 (Sched. Order) (Page ID #85).  Defendants filed a motion to dismiss for failure to state a claim on April 10, 2015.  R. 17 (Mot. to Dismiss) (Page ID #86).  Plaintiffs filed a motion for summary judgment and a memorandum in opposition to Defendants' motion to dismiss on May 15, 2015.  R. 18 (Mot. for S. J. and Opp. to Mot. to Dismiss) (Page ID #114).  Defendants filed a response in opposition to the motion for summary judgment and in reply in support of their motion to dismiss on July 2, 2015.  R. 21 (Def. Resp. in Opp. to Mot. for S. J. and Reply in Support of Mot. to Dismiss) (Page ID #189).  Plaintiffs filed a reply in support of their motion for summary judgment and a memorandum in opposition to Defendants' motion to dismiss on August 4, 2015.  R. 22 (Plaintiffs' Reply in Support of Mot. for S. J. and in Opp. to Mot. to Dismiss) (Page ID #223).  The district court held a hearing on the motions on December 22, 2015.

On January 5, 2016, the district court granted Defendants' motion to dismiss for failure to state a claim and denied Plaintiffs' motion for summary judgment.  The district court found that: (1) Pursuant to the Administrative Procedure Act, the court had jurisdiction to review the determination of HHS that the Transitional Reinsurance Program applies to health plans provided on behalf of Ohio to its employees; (2) the Program applies to state and local government employers; and (3) application of the Program to the States does not violate the

Tenth Amendment or the intergovernmental tax immunity doctrine. *Ohio v. United States*, 154 F. Supp. 3d 621 (S.D. Ohio 2016). Plaintiffs appealed. R. 26 (Notice of Appeal) (Page ID #331).

Ohio is not alone in claiming that the Program does not apply to the States. The States of Kansas, Arizona, Indiana, Louisiana, Montana, Nevada, Oklahoma, South Carolina, South Dakota, Utah, West Virginia, Wisconsin, and Wyoming have submitted an amicus brief in support of Ohio. Amici argue, as does Ohio, that the ACA does not apply the Program to the States under the ERISA definition of welfare benefit program or the clear statement rule; that state tax immunity extends beyond discriminatory laws; and that the Program interferes with state sovereignty and does not represent a traditional source of federal revenue.

## II. DISCUSSION

### A. Standard of Review

"We review *de novo* a district court's dismissal of a suit" for failure to state a claim. *United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 407 (6th Cir. 2016). "A motion to dismiss under Fed. R. Civ. P. 12(b)(6) is designed to test the sufficiency of the complaint. 'The district court must construe the complaint in a light most favorable to the plaintiff, accept all of the factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief.'" *Riverview Health Institute LLC v. Medical Mutual of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) (quoting *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995)).

We note at the outset that the district court's opinion in this case was thoughtful, evenhanded, and well-reasoned. After having conducted our own thorough and de novo review, for the reasons stated below, we affirm the district court's judgment in its entirety.

### B. Group Health Plans and the Transitional Reinsurance Program

The State of Ohio challenges the district court's determination that "Congress intended the Transitional Reinsurance Program to apply to state and local government employers in the same manner that the program applies to private-sector employers. The text, structure, and

purpose of the Affordable Care Act and related statutes compel this result." *Ohio*, 154 F. Supp. 3d at 633. Ohio's objections to the application of the Transitional Reinsurance Program to the States are both statutory and constitutional. Ohio first argues that the Program cannot apply to the States pursuant to both the "plain statement rule" and the ERISA statute. Appellants Br. at 14. Second, Ohio suggests that application of the Program to the States is unconstitutional under both the anti-commandeering doctrine and the intergovernmental tax immunity doctrine. *Id.* at 15. The United States counters that, "Plaintiffs' reliance on clear statement principles does not advance their position because the relevant statutory provisions clearly encompass their plans," Appellees Br. at 10, and "[t]heir intergovernmental tax immunity claim fails because that immunity applies to taxes that discriminate against state or local governments . . . and the transitional reinsurance program is nondiscriminatory," *id.* (internal citation omitted).

**1. The Term "group health plan" Applies to State-Provided Health Insurance Plans**

Ohio first argues that the Transitional Reinsurance Program does not apply to the States because the statute's definition of "group health plans" does not encompass plans offered to state employees. Appellants Br. at 16. Ohio is correct that Transitional Reinsurance Program statute does not explicitly define group health plans to include states nor does it list states as being required to remit payment under the ACA. The United States responds that "the Act expressly adopts the Public Health Service Act's definition of 'group health plan'. . . [which] clearly includes plans offered by state and local government employers . . . ." Appellees Br. at 11.

The relevant statute, 42 U.S.C. § 18061(b)(1)(A), requires that "health insurance issuers, and third party administrators on behalf of group health plans, are required to make payments to an applicable reinsurance entity for any plan year beginning in the 3-year period beginning January 1, 2014 . . . ." This section of the ACA does not explicitly define the term "group health plans." Instead, the statutory framework adopts a series of cross-references to both the Public Health Service Act ("PHSA") and the Employee Retirement Income Security Act of 1974 ("ERISA"). First, the ACA adopts expressly the PHSA's definition of "group health plan" as defined by 42 U.S.C. § 300gg-91(a). 42 U.S.C. § 18021(b)(3) ("The term 'group health plan' has the meaning given such term by section 300gg-91(a) of this title."). As stated in 42 U.S.C. § 300gg-91, a "group health plan" is "an employee welfare benefit plan (as defined in section

3(1) of the Employee Retirement Income Security Act of 1974 [29 U.S.C.A. § 1002(1)]) to the extent that the plan provides medical care . . . to employees or their dependents . . . directly or through insurance, reimbursement, or otherwise." ERISA defines "employee welfare benefit plan" in turn as "any plan . . . established or maintained by an employer or by an employee organization, or by both . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits . . . ." 29 U.S.C. § 1002(1).

The Public Health Service Act explicitly contemplates that plans like Ohio's are covered under the definition of "group health plan." Under a section titled "Limitation on application of provisions relating to group health plans," the PHSA specifically provides that certain "non-Federal governmental plans" may elect to be excluded from certain provisions of the PHSA. 42 U.S.C. § 300gg-21(a)(2). Congress must have therefore intended that a subset of group health plans include certain non-Federal governmental plans. The PHSA's enforcement mechanism further supports the Federal Government's argument that non-Federal governmental plans are indeed a subset of group health plans under the PHSA. Generally, the PHSA grants enforcement authority over health insurance issuers to the States. 42 U.S.C. § 300gg-22(a). However, the Federal Government exercises enforcement authority over "group health plans that are non-Federal governmental plans." *Id.* § 300gg-22(b)(1)(B).

Provisions in ERISA further support that Congress intended the term "group health plans" to include plans offered by state and local government employers. ERISA defines both "employee welfare benefit plan" and "governmental plan." 29 U.S.C. §§ 1002(1), (32). An "employee welfare benefit plan" is "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer . . . ." *Id*. § 1002(1). A "governmental plan" is "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." *Id.* § 1002(32). Similar to the PHSA, ERISA contemplates that a governmental plan is a type of employee welfare benefit plan. *See id.* § 1003(b)(1) ("The provisions of this subchapter shall not apply to any employee benefit plan if . . . such plan is a governmental plan (as defined in section 1002(32) of this title)." That

Congress provided an exclusion for governmental plans from certain provisions of ERISA that apply to employee welfare benefit plans confirms, under the ERISA definition that applies to the ACA, that governmental plans are employee welfare benefit plans.  To conclude otherwise "violates the interpretive canon that cautions against construing statutory language in a way that renders any of it superfluous."  *U.S. v. Llanez-Garcia*, 735 F.3d 483, 498 (6th Cir. 2013).

Ohio contends that reliance on ERISA is misplaced because ERISA's definition of the term "employee benefit plan" uses the word "employer" which is defined elsewhere in the statute using, inter alia, the word "person."  Appellants Br. at 19.  We need not reach this issue because the definitions in the PHSA and ERISA are clear that the term "group health plans" under the ACA encompasses employee welfare benefit plans, which include governmental plans.  We have previously rejected an argument similar to Ohio's.  *See Cunningham v. Gibson Cty.*, Nos. 95-6665, 95-6667, 1997 WL 123750, at *2 (6th Cir. Mar. 18, 1997) ("[I]f defendants' argument that local governments are not persons within the meaning of [the Fair Labor Standards Act] is accepted, the result is exemption of local governments from even FLSA's most fundamental provisions.  As this cannot be understood to have been the intent of Congress, the defendants' argument must fail.").  Similarly, adopting Ohio's argument that ERISA's use of the term "person" evinces Congress's intent not to cover states requires that the statute's explicit indications to the contrary be ignored.  We will not do so.  Congress has demonstrated an ability explicitly to exempt state and local governments from certain requirements in the past, and it chose not to do so with respect to the Program.  We therefore conclude that Congress intended the Transitional Reinsurance Program to apply to the States with the same force that it applies to private employers.

### 2.  Ohio's *Michigan v. United States* and "Plain Statement Rule" Arguments Fail

Ohio next argues that the health plans it offers to its employees and those plans offered to the employees of its subdivisions do not qualify as group health plans under the Act because Congress has never made a plain statement of its intent.  The United States responds that "[c]lear statement principles do not advance [Ohio's] position, because the relevant statutory text clearly encompasses [Ohio's] plans."  Appellees Br. at 24.  Ohio relies heavily on *Michigan v. United States* for the proposition that Congress must make a plain statement regarding any tax that it

wishes to impose directly against a state. *Mich. v. U.S.*, 40 F.3d 817, 824 (6th Cir. 1994). In *Michigan*, we held both that the Michigan Educational Trust, which was established to assist parents in financing their children's college educations, was a public agency not subject to federal income taxation in the absence of a plain statement from Congress, and that the plain statement rule applies in the tax field. 40 F.3d at 818. Ohio is correct that in *Michigan* we reiterated that "before a federal tax can be applied to activities carried on directly by the States . . . the intention of Congress to tax them should be stated expressly and not drawn merely from general wording of the statute applicable ordinarily to private sources of revenue." *Id*. at 823 (internal quotation marks omitted).

Ohio, however, asks too much of the ACA. The Supreme Court has "never required that Congress make its clear statement in a single section or in statutory provisions enacted at the same time." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 76 (2000). Thus, we conclude that the ACA's cross-reference definitional scheme is perfectly appropriate. *See also Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 824 (2013) (holding that Congress need not "incant magic words in order to speak clearly," and requiring that the Court "consider 'context, including this Court's interpretations of similar provisions in many years past.'"(citation omitted)). When considering the Transitional Reinsurance Program in the context of the ACA (including the relevant definitions provided by the PHSA and ERISA) and our interpretations of similar provisions in cases past, we conclude that it is evident that Congress intended the term "group health plans" to encompass Ohio's plan.

Ohio's reliance on *Michigan* is misplaced for another important reason: *Michigan* dealt with a statutory scheme that was directed specifically toward corporations. The United States in *Michigan* failed to provide any evidence that Congress intended to tax state trusts, and even conceded that the statute had never been interpreted as so doing. *Michigan*, 40 F.3d at 823. By contrast, there is no question that the ACA, at least in part, applies to the States. The only issue before us is whether the term "group health plan" is meant to encompass health plans offered by state employers to their employees. A close and careful reading of the ACA and its cross-references compels an answer in the affirmative. Congress's plain statement that the Program applies to the States can be found in the series of cross-references discussed supra. We therefore

conclude that Ohio's statutory challenge fails, and the Transitional Reinsurance Program applies to the State of Ohio.

## C. Ohio's Constitutional Claims

Ohio next argues that applying the Transitional Reinsurance Program to the States violates the Tenth Amendment to the United States Constitution. Specifically, Ohio objects to application of the Program under both the anti-commandeering and intergovernmental tax immunity doctrines. Ohio is concerned that the Program "requires an extraordinarily expansive, uncabined theory of federal power . . . under which federal politicians would be free to try to accrue political support through any type of corporate welfare scheme imaginable and then shirk accountability for total costs by ordering the States to collect money from their own citizens . . . ." Appellants Br. at 53. Further, Ohio argues, instead of aiding Ohio or its employees in connection with the State's money, the program "transfers money to private companies (that by definition do not insure the State employees) and [] takes for the federal general fund dollars that by law cannot be used for the purposes of the federal program under which the tax arises." *Id.* We find Ohio's alarmist posturing unpersuasive because the Program does not commandeer Ohio's legislative authority nor does it violate any remaining vestiges of the intergovernmental tax immunity doctrine.

### 1. Ohio's Anti-commandeering Claim is Foreclosed by *Garcia v. San Antonio Metropolitan Transportation Authority*.

Ohio first argues that payments to Transitional Reinsurance Program violate the Tenth Amendment because the Program commandeers Ohio's regulatory apparatus. The Supreme Court *in Garcia v. San Antonio Metropolitan Transit Authority* faced the question of whether there existed a Tenth Amendment violation where a state governmental employer was required to meet the overtime and minimum-wage requirements of the Fair Labor Standards Act (FLSA). 469 U.S. 528, 530 (1985). The Court found no violation because "Congress' action in affording SAMTA employees the protections of the wage and hour provisions of the FLSA contravened no affirmative limit on Congress' power under the Commerce Clause." *Id.* at 555–56. The *Garcia* Court held that the Tenth Amendment did not prohibit Congress from regulating state employers in the same manner that it regulates private-sector employers. We have similarly held that

Congress may enact "generally applicable laws that regulate state activities in the same manner as private conduct" and not violate the Tenth Amendment. *See EEOC v. Ky. Ret. Sys.*, 16 F. App'x 443, 452 (6th Cir. 2001).

Ohio's principal argument that the Program commandeers the State's regulatory apparatus relies almost exclusively on *Printz v. United States*, 521 U.S. 898, 930 (1997), and *New York v. United States*, 505 U.S. 144, 169 (1992). In *Printz*, a federal firearms law required that the chief law-enforcement officer in each local jurisdiction conduct certain checks to ensure compliance with the statute until a national background-check system was operative. *Printz*, 521 U.S. at 902. In the 1992 *New York* case, the Federal Government mandated that the States provide for disposal of certain low-level radioactive waste, and in some instances take title to and become liable for all damages caused by a state's failure promptly to take possession of said waste. *New York*, 505 U.S. at 150–51. The Supreme Court struck down both laws on the grounds that Congress impermissibly commandeered the legislative process of the States.

Neither *Printz* nor *New York* is applicable in this case. The congressional action in both cases required that certain state actors engage in specific conduct in order to comply with the statute. As we have previously held, there exists an important distinction in the Supreme Court's anti-commandeering cases between "generally applicable laws that regulate state activities in the same manner as private conduct," which have been held constitutional, and laws "that seek to control or influence the manner in which the States regulate private conduct," which are unconstitutional. *See Ky. Ret. Sys.*, 16 F. App'x at 452. *See also South Carolina v. Baker*, 485 U.S. 505, 514 (1988) (holding that a federal tax law was constitutional where it "regulates state activities" and does not "seek to control or influence the manner in which States regulate private parties"); *Reno v. Condon*, 528 U.S. 141, 151 (2000) (upholding a federal law because it "does not require the States in their sovereign capacity to regulate their own citizens."). We cannot conclude that the Program seeks to control or influence the manner in which a state regulates private parties. Instead, it regulates the States directly by requiring participation in the Program in the exact same manner that it requires participation by private employers. This is a classic case of congressional action that is constitutionally permissible under the Tenth Amendment, and we therefore find Ohio's anti-commandeering arguments unpersuasive.

As the district court so aptly noted, "[t]he Affordable Care Act requires Ohio and its instrumentalities and political subdivisions to *comply* with a federal regulatory program, not to implement one." *Ohio*, 154 F. Supp. 3d at 659. We therefore conclude that the Federal Government has not commandeered the States by requiring participation in the Transitional Reinsurance Program in the same manner that it requires participation by private employers.

## 2. The Program Does Not Violate the Intergovernmental Tax Immunity Doctrine

Ohio's final argument is that the Transitional Reinsurance Program is a violation of the intergovernmental tax immunity doctrine, the concept that the federal and state governments should not tax each other. *See New York v. United States*, 326 U.S. 572, 576 (1946) ("[T]he fear that one government may cripple or obstruct the operations of the other early led to the assumption that there was a reciprocal immunity of the instrumentalities of each from taxation by the other."). The district court concluded that the Program does not run afoul of the intergovernmental tax immunity doctrine because that doctrine "now protects only against *discriminatory* taxes levied directly on the states," and that "the Transitional Reinsurance Program imposes reinsurance contributions on private-sector employers and state and local government employers equally—i.e., non-discriminatorily." *Ohio*, 154 F. Supp. 3d at 659. We agree.

In the 1946 *New York v. United States* case, the Supreme Court upheld a federal tax imposed on the State of New York's bottling and sale of mineral water. *New York*, 326 U.S. at 573–74. Under the law at the time, public instrumentalities of the States were immune from taxation provided they were performing a "governmental function" and not a business or proprietary function. *Id.* at 579–80. The *New York* Court abandoned that rigid distinction, though no majority of the justices could agree upon a single rationale, with two justices agreeing that any non-discriminatory tax imposed upon a state was constitutional and four justices finding that a non-discriminatory tax could be unconstitutional if it "interfere[s] unduly with the State's performance of its sovereign functions of government." *Id.* at 587–89. The Supreme Court has only occasionally subsequently addressed the intergovernmental tax immunity doctrine.

A tax against the States will withstand a Tenth Amendment challenge if it: (1) does not discriminate against the States; and (2) can be remedied through the political process. *See Massachusetts v. U.S.*, 435 U.S. 444, 456 (1978) ("the political process is uniquely adapted to accommodating the competing demands 'for national revenue, on the one hand, and for reasonable scope for the independence of state action on the other.'"(citation omitted)); *Baker*, 485 U.S. at 526 n.15 ("the threat of destroying another government can be realized only if the taxing government is willing to impose taxes that will also destroy itself or its constituents."). *See also W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 200 n.17 (1994) (noting that "in the field of intergovernmental taxation . . . nondiscrimination . . . plays a central role in setting the boundary between the permissible and the impermissible.").

Ohio concedes that "the immunity doctrine has been narrowed over the years, and it is no longer understood to forbid indirect taxes on items such as state employee salaries or income from state contracts." Appellants Br. at 56 (citing *Baker*, 485 U.S. at 520–23). Ohio urges us to examine closely the plurality opinion delivered in *Massachusetts v. United States*, which recognized "the limitation the existence of the States constitutionally imposes on the national taxing power." 435 U.S. at 459. However, we conclude that reliance on *Massachusetts* is misplaced, as that Court had "no occasion to decide either the present vitality of the doctrine of state tax immunity or the conditions under which it might be invoked." *Id.* at 454. Indeed, the *Massachusetts* Court upheld a federal fee that was applied to state-owned property. *Id.* at 446. *Michigan v. United States*, the very case upon which Ohio so heavily relies for its statutory argument, speaks directly to the question of immunity. *See Mich. v. U.S.*, 40 F.3d at 822 ("The broad constitutional immunity from federal taxation once thought to be enjoyed by states . . . has been severely eroded . . . and several years ago the Supreme Court suggested that it is now an open question whether there is 'any' extent 'to which States are currently immune from direct non-discriminatory federal taxation.'" (quoting *Baker*, 485 U.S. at 518 n.11)). As this court noted in *Michigan*, "today's Supreme Court would say that Congress is free to impose a non-discriminatory tax" on a state government. *Id.* at 823.

At least one of our sister circuits agrees with the district court's conclusion that any intergovernmental immunity analysis requires examination of discriminatory application. The

Seventh Circuit in *Travis v. Reno*, 163 F.3d 1000 (7th Cir. 1998), upheld a federal statute that levied upon the States certain fines for their failure to comply with its strictures. In upholding the statute, the court noted that:

> Gradually intergovernmental immunity turned into a rule of nondiscrimination, under which the governmental body's protection is vicarious: one government may tax (or regulate) another's trading partners only to the extent it imposes equivalent burdens on those who do business with private citizens. Neutrality between governmental and private spheres is a principal ground on which the Supreme Court has held that states may be subjected to regulation when they participate in the economic marketplace—for example, by hiring workers covered by the Fair Labor Standards Act. So long as public market participants are treated the same as private ones, they enjoy the protection the latter have been able to secure from the legislature; and as Congress is not about to destroy private industry (think what that would do to the tax base!) it can not hobble the states either.

163 F.3d at 1002–03 (citations omitted). While the Seventh Circuit was not directly confronted with a challenge to the intergovernmental tax immunity doctrine, we find its logic persuasive, and in line with our conclusion in *Michigan*. Whether the intergovernmental tax immunity doctrine is one which the Supreme Court would acknowledge as having any force today is an open question. We thus agree with the district court that "even under the State's erroneous view of the continued validity of the intergovernmental tax immunity doctrine, the Transitional Reinsurance Program remains constitutional." *Ohio*, 154 F. Supp. 3d at 665.

We conclude that the tax imposed under the Transitional Reinsurance Program is a non-discriminatory tax applied evenly to public and private group health plans. Application of the Program to the State of Ohio does not violate the intergovernmental tax immunity doctrine.

### III.  CONCLUSION

Because the Transitional Reinsurance Program was intended to apply to the State of Ohio, and because its application does not run afoul of the important principles of federalism or the Tenth Amendment to the United States Constitution, we **AFFIRM** the grant of the United States's motion to dismiss and the denial of Ohio's motion for summary judgment.